AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Seizure of <br> *(Briefly describe the property to be seized)* <br><br> THE MOTOR YACHT TANGO, <br> WITH INTERNATIONAL MARITIME <br> ORGANIZATION NUMBER 1010703 | )<br>)<br>)<br>)<br>)<br>)  Case No.   22-sz-5 |

## APPLICATION FOR A WARRANT TO
## SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the jurisdiction of the District of _____ Columbia _____ is subject to forfeiture to the United States of America under _____ U.S.C. § _____ *(describe the property)*:

18 U.S.C. § 1349; 50 U.S.C. § 1705(a); 18 U.S.C. § 1956(a)(2) & (h); 18 U.S.C. §§ 981(a) & 982; 28 U.S.C. § 2461(c)

(describe the property):  TANGO (International Maritime Organization ("IMO") No. 1010703) (the "TANGO"), to include all chattels on board, in inventory, or in transit to the vessel.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

❐ Continued on the attached sheet.

_____
*Applicant's signature*

Cindy Burnham, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    03/25/2022
_____
*Judge's signature*

City and state:   District of Columbia

Zia M. Faruqui, United States Magistrate Judge
_____
*Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Seizure of | ) | |
| *(Briefly describe the property to be seized)* | ) | |
| THE MOTOR YACHT TANGO, | ) | Case No.   22-sz-5 |
| WITH INTERNATIONAL MARITIME | ) | |
| ORGANIZATION NUMBER 1010703 | ) | |

## WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests that certain property located in the    jurisdiction of the        District of        Columbia        be seized as being subject to forfeiture to the United States of America.  The property is described as follows:

TANGO (International Maritime Organization ("IMO") No. 1010703), to include all chattels on board, in inventory, or in transit to the vessel, pursuant to 18 U.S.C. § 1349; 50 U.S.C. § 1705(a); 18 U.S.C. § 1956(a)(2) & (h); 18 U.S.C. §§ 981(a) & 982; 28 U.S.C. § 2461(c)

 AS FURTHER DESCRIBED IN THE AFFIDAVIT

I find that the affidavit(s) and any recorded testimony establish probable cause to seize the property.

**YOU ARE COMMANDED** to execute this warrant and seize the property on or before        04/07/2022
*(not to exceed 14 days)*

❑ in the daytime – 6:00 a.m. to 10:00 p.m.        ☑ at any time in the day or night, as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must also give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

An officer present during the execution of the warrant must prepare, as required by law, an inventory of any property seized and the officer executing the warrant must promptly return this warrant and a copy of the inventory to United States Magistrate Judge        Zia M. Faruqui        .
*(name)*

❑ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ❑ for _____ days *(not to exceed 30).*

❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:      03/25/2022_____        _____
                                                                                            *Judge's signature*

City and state:      District of Columbia_____        Zia M. Faruqui, United States Magistrate Judge
                                                                                            *Printed name and title*

AO 109 (Rev. 12/09)  Warrant to Seize Property Subject to Forfeiture (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>22-sz-5 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of:

Inventory of the property taken:

| Certification |
|---|

          I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

                                                                    _____
                                                                    *Executing officer's signature*

                                                                    _____
                                                                    *Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF THE MOTOR YACHT TANGO, WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 1010703** | **CASE NO. 22-sz-5** <br><br> **FILED UNDER SEAL** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEIZURE WARRANT

I, Cindy Burnham, a Special Agent with Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state as follows:

1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") working in the Minneapolis, Minnesota field office. I have been employed as a Special Agent since April 16, 2006. My responsibilities include the enforcement of federal laws involving international terrorism, U.S. sanctions, and laws involving the illegal export of U.S.-origin. As a Special Agent of the FBI, I am authorized to investigate violations of the laws of the United States, and to execute search and seizure warrants issued under the authority of the United States. I have conducted and participated in other investigations related to violations of U.S. export laws and regulations. During my tenure as Special Agent with FBI I have been involved in the investigation of such crimes as the illegal export of commodities and/or technology. I am currently assigned to conduct investigations involving the illegal export of controlled items, which are regulated by the U.S. Government, including the Department of Commerce and the Department of Homeland Security.

2.      I have been one of the case agents in this investigation.  During my work on this investigation, I have reviewed reports prepared by agents and discussed this case and other related cases with agents, law enforcement officers, and partners at other U.S. Government agencies who have been involved in these investigations. I submit this affidavit based upon personal knowledge derived from my participation in this investigation, and information that I have received from a

variety of other sources, including law enforcement officers and agents, witness interviews, public records, bank records, and documents discussed herein.

## I.   **INTRODUCTION**

3.      This affidavit is made in support of a seizure warrant for the vessel known as the TANGO (International Maritime Organization ("IMO") No. 1010703) (the "TANGO"), a motor yacht built in 2011 and owned by Viktor Vekselberg, a Russian national, which is currently located in the port of Palma de Mallorca, Spain. References herein to the TANGO refer to the vessel itself, to include all chattels on board, in inventory, or in transit to the vessel.

4.      As further described herein, the TANGO is an asset of Vekselberg. On or about April 6, 2018, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") designated Vekselberg as a Specially Designated National, as further described herein. As detailed herein, there is probable cause to believe that:

   a.   Between 2011-present, Vekselberg and his coconspirators conspired to commit bank fraud by structuring transactions about the TANGO in such a manner as to obfuscate Vekselberg's ownership interest therein and in order to cause U.S. financial institutions to process U.S. dollar transactions. Further, there is probable cause to believe that the deceptive practices allowed Vekselberg and his coconspirators to evade U.S. financial institutions' Know Your Customer investigations on these transactions and the reporting of the transactions to the Treasury Department, and ultimately, U.S. financial institutions processed these transactions;

   b.   From April 6, 2018 to the present, Vekselberg and those acting on his behalf and for his benefit caused U.S. dollar transactions for the TANGO to be sent through

U.S. financial institutions, after a time which Vekselberg was designated by the Treasury Department. Further, there is probable cause to believe that Vekselberg had an interest in the TANGO and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained; and

c.  Vekselberg and his coconspirators conspired to and did cause funds to be transferred internationally with the intent to promote the carrying on of his bank fraud conspiracy and IEEPA violations, with the intent to conceal the true nature of the ownership of the proceeds, and with the intent to avoid transaction reporting requirements under federal law.

5.  There is probable cause to believe that the TANGO is subject to seizure and forfeiture based on violations of 18 U.S.C. § 1349 (conspiracy to commit bank fraud), 50 U.S.C. § 1705(a)) (International Emergency Economic Powers Act ("IEEPA")), and 18 U.S.C. § 1956(a)(2) & (h) (money laundering & conspiracy). Specifically, 18 U.S.C. § 981(a)(1)(A) & (C) provide for forfeiture of property that is (i) "involved in" a transaction in violation of 18 U.S.C. § 1956 or (ii) "constitutes" "proceeds traceable" to a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, bank fraud and violations of IEEPA).

6.  This Court has venue over the forfeiture action because "acts or omissions giving rise to the forfeiture occurred" in the District. *See* 28 U.S.C. § 1355(b)(2)); *see also One Gold Ring with Carved Gemstone*, 2019 WL 5853493, at *1 (citing 28 U.S.C. § 1355(b)(2)) ("This court is the sole jurisdiction where such litigation is properly lodged."). To the extent that the Target Property is seized in a foreign jurisdiction or upon the high seas, this Court additionally has jurisdiction. *See United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. 20-CV-1791, 2020 WL 3771953 (D.D.C. July 2, 2020) ("[T]his Court has

venue and jurisdiction over the Defendant Properties: (i) as they are located in a foreign country or have been detained by a foreign authority, pursuant to 28 U.S.C. § 1355(b)(2); and/or (ii) as they are on the high seas, pursuant to 14 U.S.C. § 522(a) and 28 U.S.C. § 2461(b).").

## II.   STATUTES

### A.   IEEPA

7.     This action relates to violations of regulations and executive orders issued pursuant to International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. § 1701 *et seq.*).  Enacted in 1977, IEEPA gives the President certain powers, defined in 50 U.S.C. § 1702, to deal with any threats with respect to which the President has declared a national emergency, and prescribes criminal penalties for violations.  Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."  50 U.S.C. § 1705(a).

8.     Pursuant to his authority under IEEPA and the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.*) ("NEA"), on March 6, 2014, the President issued Executive Order ("E.O.") 13660, declaring a national emergency to deal with the threat posed by the actions and policies of certain persons who had undermined democratic processes and institutions in Ukraine; threatened the peace, security, stability, sovereignty, and territorial integrity of Ukraine; and contributed to the misappropriation of Ukraine's assets. In further response to the actions and polices of the Government of the Russian Federation, including the purported annexation of the Crimea region of Ukraine, the President issued three subsequent Executive Orders that expanded the scope of the national emergency declared in E.O. 13660.

a.  Pursuant to his authority under IEEPA and the NEA, on March 16, 2014, the President issued E.O. 13661 to expand the scope of the national emergency declared in E.O. 13660 of March 6, 2014.

b.  Pursuant to his authority under IEEPA and the NEA, on March 20, 2014, the President issued E.O. 13662 to further expand the scope of the national emergency declared in Executive Order 13660 of March 6, 2014, and expanded E.O. 13661 of March 16, 2014.

c.  Pursuant to his authority under IEEPA and the NEA, on December 19, 2014, the President issued E.O. 13685 to take additional steps to address the Russian occupation of the Crimea region of Ukraine. E.O. 13685 prohibits the exportation or importation of any goods, services, or technology to or from the Crimea region of Ukraine, and prohibits new investment in the Crimea region of Ukraine by a U.S. person, wherever located.

9.  Together, these orders (hereinafter "the Russia/Crimea sanctions") authorize, among other things, the imposition of sanctions against persons responsible for or complicit in certain activities with respect to Ukraine; against officials of the Government of the Russian Federation; against persons operating in the arms or related materiel sector of the Russian Federation; and against individuals and entities operating in the Crimea region of Ukraine.

10.  On May 8, 2014, OFAC issued a set of regulations to implement the Russia/Crimea Sanctions (79 Fed. Reg. 26365, May 8, 2014). *See* 31 C.F.R. part 589, Ukraine-Related Sanctions Regulations (the "Regulations") for details.

11.      On July 16, 2014, the Secretary of the Treasury, after consultation with the Secretary of State, issued a determination that section 1(a)(i) of E.O. 13662 shall apply to the financial services and energy sectors of the Russian economy.

12.      On September 12, 2014, the Secretary of the Treasury, after consultation with the U.S. Secretary of State, issued a determination that section 1(a)(i) of E.O. 13662 shall also apply to the defense and related materiel sector of the Russian economy.

13.      The Russia/Crimea sanctions also block the property and interests in property of individuals and entities listed in the Annex to E.O. 13661 or of those determined by the U.S. Secretary of the Treasury, after consultation with the Secretary of State, to meet the criteria in E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685, including those determined:

    a.   To be responsible for or complicit in, or to have engaged in, directly or indirectly, any of the following:

        i.   Actions or policies that undermine democratic processes or institutions in Ukraine;

        ii.   Actions or policies that threaten the peace, security, stability, sovereignty, or territorial integrity of Ukraine; or

        iii.   Misappropriation of state assets of Ukraine or of an economically significant entity in Ukraine;

    b.   To have asserted governmental authority over any part or region of Ukraine without the authorization of the Government of Ukraine;

    c.   To be a leader of an entity that has, or whose members have, engaged in any activity described in E.O. 13660 or of an entity whose property and interests in property are blocked pursuant to E.O. 13660;

d.  To be an official of the Government of the Russian Federation;

e.  To operate in the arms or related materiel sector in the Russian Federation;

f.  To operate in such sectors of the Russian Federation economy as may be determined by the Secretary of Treasury, in consultation with the Secretary of State;

g.  To operate in the Crimea region of Ukraine;

h.  To be a leader of an entity operating in the Crimea region of Ukraine;

i.  To be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly a senior official of the Government of the Russian Federation; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685; or

j.  To have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of a senior official of the Government of the Russian Federation; activity described in subsections a(i) or a(ii) of E.O. 13660; or a person whose property and interests in property are blocked pursuant to E.O. 13660, E.O. 13661, E.O. 13662, or E.O. 13685.

14.  Blocking sanctions against individuals and entities designated pursuant to the Russia/Crimea sanctions result in the individuals and entities being listed on the Treasury Department's List of Specially Designated Nationals and Blocked Persons ("SDN List"). Unless otherwise authorized or exempt, transactions by U.S. persons (including U.S. financial institutions) or in the United States are prohibited if they involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an entity or individual listed on the SDN List because of the Russia/Crimea sanctions. The property and interests in property of an entity that is 50 percent or more owned, whether individually or in the aggregate, directly or

indirectly, by one or more persons whose property and interests in property are blocked pursuant to any part of 31 C.F.R. chapter V are also blocked, regardless of whether the entity itself is listed.

    a.   As defined, "an interest in property" means "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 589.304.

    b.   As defined, "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, . . . ships, goods on ships, . . . negotiable instruments, . . . accounts payable, . . . services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent." 31 C.F.R. § 589.308.

15.    An individual or entity may obtain a license from OFAC to transact with an individual or entity on the SDN List. OFAC's licensing authority is located in Washington, D.C.

16.    The failure to obtain a license prior to transacting with an SDN is a violation of IEEPA, 50 U.S.C. § 1705(a).

**B.    Correspondent Banking and the Bank Secrecy Act**

17.    Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency

conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

18.    According to the Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

19.    The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to avoid sanctions programs administered by OFAC. Pursuant to these programs, U.S. financial institutions block correspondent banking transactions where an SDN is listed as the sender of the transaction, unless an OFAC license is provided for the transaction.

20.    The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.* in furtherance of its mission to safeguard the U.S. financial system. Under the Bank Secrecy Act, financial institutions are required to assist U.S. government agencies in detecting and preventing money laundering, including reporting suspicious activity that might signal criminal activity (*e.g.*, money laundering, tax evasion). Additionally, an amendment to the Bank Secrecy Act incorporates provisions of the USA Patriot Act, which requires every bank to adopt a customer identification program (*i.e.*, Know Your Customer ("KYC")) as part of its Bank Secrecy Act compliance program. 12 C.F.R. § 21.11; 12 C.F.R. § 21.21.

21.    FinCEN has issued guidance to U.S. financial institutions related to reporting of suspicious activity related to Russia, including:

a.  In July 2000, FinCEN warned U.S. financial institutions "of serious deficiencies in the counter-money laundering systems of the Russian Federation." *See* FinCEN Advisory 25, Transactions Involving the Russian Federation (July 2020). Among other things, the Advisory warned that "Russia suffers from serious systemic problems. Russia lacks comprehensive counter-money laundering laws and regulations that meet international standards."

b.  In April 2008, FinCEN instructed U.S. financial institutions that "consistent with the standard for reporting suspicious activity as provided for in 31 C.F.R. part 103, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or other violation of law or regulation, the financial institution should then file a Suspicious Activity Report" ("SAR"). FinCEN, FIN-2008-G005, Guidance to Financial Institutions on Filing Suspicious Activity Reports Regarding the Proceeds of Foreign Corruption (April 17, 2008).

c.  In August 2017, FinCEN warned U.S. financial institutions about the use of shell companies in order to "obscure the illicit origin of . . . funds." *See* FinCEN, FIN-2017-A003, Advisory to Financial Institutions and Real Estate Firms and Professionals (Aug. 22, 2017). "Shell companies can often be formed without disclosing the individuals that ultimately own or control them (*i.e.*, their beneficial owners) and can be used to conduct financial transactions without disclosing their true beneficial owners' involvement. Criminals abuse this anonymity to mask their

10

identities, involvement in transactions, and origins of their wealth, hindering law

enforcement efforts to identify individuals behind illicit activity."

    d.   In June 2018, FinCEN warned U.S. financial institutions that "[f]oreign corrupt

[politically exposed persons] PEPs, through their facilitators, may amass fortunes

through the misappropriation of state assets and often exploit their own official

positions to engage in  . . . money laundering, embezzlement of state funds, and

other corrupt activities." *See* FinCEN, FIN-2018-A003, Advisory on Human Rights

Abuses Enabled by Corrupt Senior Foreign Political Figures and Their Financial

Facilitators (June 12, 2018). "PEP facilitators commonly use shell companies to

obfuscate ownership and mask the true source of the proceeds of corruption."

**C.**    **Forfeiture Statutes**

22.    This application seeks a seizure warrant under both civil and criminal authorities

because the Target Property could easily be placed beyond process if not seized by a warrant.

23.    Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under § 981 may be

seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture

action against the property may be filed," if there is probable cause to believe the property is

subject to forfeiture.  Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 [other than

subsection (d)] for all stages of a criminal forfeiture proceeding. Section 853(f) permits the

government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

Thus, seizure warrants may be obtained outside of the district where the property to be seized is

located.

24.    Pursuant to 18 U.S.C. § 981(a)(1)(A) & (C) and 28 U.S.C. § 2461, any property,

real or personal that (i) is involved in a transaction in violation of 18 U.S.C. § 1956 or (ii)

constitutes proceeds of a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D);
here, bank fraud and violations of IEEPA) is subject to forfeiture.

25.     Under 18 U.S.C. § 981(a)(2)(A), the term "proceeds" is defined as "property of any
kind obtained directly or indirectly, as the result of the commission of the offense giving rise to
forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized
from the offense."

26.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a
transaction or attempted transaction, in violation of 18 U.S.C. § 1956, or any property traceable to
such property is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 982(a)(1), any property, real
or personal, involved in a violation of 18 U.S.C. § 1956, or any property traceable to such property
is subject to criminal forfeiture. These money laundering forfeiture authorities apply to a larger
class of property than traditional forfeiture authorities.

    a.   Money laundering based forfeitures are not limited to the proceeds of the crime.
         Money laundering forfeiture encompasses all property "involved in" the crime,
         which can include so-called "clean" or "legitimate" money that is comingled with
         "tainted" money derived from the specified unlawful activity.

27.     In a forfeiture proceeding, the Court will determine the amount of forfeiture based
on the overall criminal venture.

    a.   "The calculation of forfeiture amounts is not an exact science," and courts may "use
         general points of reference as a starting point for calculating the losses or gains
         from fraudulent transactions and may make reasonable extrapolations from the
         evidence established by a preponderance of the evidence." *United States v. Treacy*,
         639 F.3d 32, 48 (2d Cir. 2011).

b. Criminal forfeiture can take into account all of the conspiracy's gains that any defendant could have foreseen. *See United States v. Fruchter*, 411 F.3d 377, 384 (2d Cir. 2005); *United States v. Lo*, 839 F.3d 777, 794 (9th Cir. 2016) (where pleads to only certain offensive conduct that is relevant to an overall scheme, "the court was authorized to order forfeiture of the funds obtained from those schemes, including from the additional executions of the schemes alleged in the indictment and admitted in the plea agreement").

## III. PROBABLE CAUSE

### A. Background on Viktor Vekselberg

28.    Viktor Vekselberg is a Russian national and the founder and Chairman of the Board of Directors of the Renova Group ("Renova"). According to OFAC's April 6, 2018, designation of these entities, "the Renova Group is comprised of asset management companies and investment funds that own and manage assets in several sectors of the Russian economy, including energy." Vekselberg and Renova were first designated by the Treasury Department on April 6, 2018.

29.    Vekselberg has a history of allegations and lawsuits lodged against him in various jurisdictions due to his business practices:

a. According to allegations in a later-filed lawsuit, in 2001, Renova founders Vekselberg and Leonard Blavatnik engaged in a "widespread racketeering and money laundering scheme." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 304 F. Supp. 2d 570, 572 (S.D.N.Y. 2004), vacated and remanded, 416 F.3d 146 (2d Cir. 2005). The case alleged that "American and other international banking facilities have allegedly been used to conceal financial transactions through which Defendants have diverted oil and related revenues from Russian companies to their

13

own offshore affiliates and have committed tax fraud in several countries." *Id.*  The case further alleged that Vekselberg and his associates used armed soldiers and corrupted Russian court proceedings to gain control of a Siberian oilfield belonging to Norex. *Id.*at 573.

b.  In 2004, public reporting from Russia claimed that Vekselberg was involved in a scandal surrounding theft of client funds from First City Bank, the proceeds of which Vekselberg allegedly used to buy Faberge eggs.[1]

c.  In 2006, Vekselberg and others were sued by investors who claimed that he had "engaged in a racketeering scheme to control and loot Nikopol [Ferro-Alloy Plant] by diverting hundreds of millions of dollars of Nikopol's profits for their own benefit." *Athina Invs. Ltd. v. Pinchuk,* 443 F. Supp. 2d 177, 179 (D. Mass. 2006).

d.  In 2010, Reuters reported that the Swiss Finance Ministry fined Vekselberg approximately $40 million related to 2006 stock trades of a Swiss company that appeared to be done in alliance with other traders.[2]

e.  In 2016, Reuters reported that Russian law enforcement arrested multiple executives at firms controlled by Vekselberg for bribery in connection with Vekselberg's companies.[3]

---

[1]  *See* Osborne, Andrew. Bankrupt Bank's Victims Cry Foul Over Faberge Eggs (May 27, 2004), *available at* https://www.nzherald.co.nz/world/bankrupt-banks-victims-cry-foul-over-faberge-eggs/UK3NBG3QONWTC3ZKROYBSVI2EU/.
[2]  *See* Reid, Kate. Russia's Vekselberg Faces Record Swiss Fine (Jan 28, 2010), *available at* https://www.reuters.com/article/renova-fine/russias-vekselberg-faces-record-swiss-fine-idUKLDE60R0DV20100128.
[3]  *See*  Lyrchikova, Anastasia. Associates of Russian Tycoon Vekselberg Held in Bribery Probe (Sept. 5, 2016), *available at* https://www.reuters.com/article/us-russia-vekselberg-bribes/associates-of-russian-tycoon-vekselberg-held-in-bribery-probe-idUSKCN11B1AB.

30.    I am aware that, even before the Treasury Department designated Vekselberg in 2018, U.S. financial institutions were monitoring Vekselberg's and his company's transactions. According to bank records obtained during the investigation, on multiple occasions between 2010-2017, U.S. financial institutions reviewed Vekselberg's transactions, and noted:

    a.   Negative news reporting and legal actions, including the aforementioned, regarding Vekselberg and allegations of fraud, bribery, corruption;

    b.   Payments between multiple apparent shell corporations that had connections to Renova and Vekselberg;

    c.   Rapid transfers of wires between parties that are involved in apparent unrelated industries;

    d.   Sources of money transfers that could not be confirmed; and

    e.   Complex structuring of payments evidencing layering of transactions between multiple parties and jurisdictions.

**B.    Relevant Sanctions**

31.    Pursuant to the Russia/Crimea sanctions (specifically, E.O. 13662), on or about April 6, 2018, the Treasury Department designated Vekselberg as a specially designated national. In announcing the designations, then-Secretary Steven T. Mnuchin stated, "The Russian government operates for the disproportionate benefit of oligarchs and government elites. The Russian government engages in a range of malign activity around the globe, including continuing to occupy Crimea and instigate violence in eastern Ukraine, supplying the Assad regime with material and weaponry as they bomb their own civilians, attempting to subvert Western democracies, and malicious cyber activities.  Russian oligarchs and elites who profit from this

corrupt system will no longer be insulated from the consequences of their government's destabilizing activities."

32.     The April 6, 2018, designation listed Vekselberg among the "Russian Oligarchs" being designated and stated that Vekselberg was "designated for operating in the energy sector of the Russian Federation economy."

33.     On or about March 11, 2022, the Treasury Department further designated Vekselberg under a new set of sanctions following the Russian Federation's invasion of Ukraine. Specifically, Vekselberg was "redesignated pursuant to E.O. 14024 [issued Apr. 19, 2021] for having acted or purported to act for or on behalf of, directly or indirectly, the [Government of the Russian Federation ("GoR")] and also for operating or having operated in the technology sector of the Russian Federation economy." The March 11, 2022, designation stated,

   a.   "Vekselberg is a prominent Russian businessman with an estimated net worth exceeding $6 billion . . . . Vekselberg's extensive holdings, predominantly consolidated through his designated Renova Group of companies, span multiple sectors of the Russian Federation economy, and are intertwined with some of the GoR global initiatives, such as the Rusnano Group, one of the largest technological investors in Russia which provides a revenue source to the GoR."

   b.   "Vekselberg has maintained close ties with leading GoR officials, including [President Vladimir] Putin and former Russian President, Dmitry Medvedev (Medvedev). Medvedev personally appointed Vekselberg to serve as director and president of the Skolkovo Foundation (SF), a GoR initiative aimed at creating a Russian version of Silicon Valley in order to elevate Russia's international status as a leading innovation center for technological developments. Following his prior

designation, Vekselberg no longer holds this position with SF. Furthermore, Vekselberg has taken part in Russian diplomatic and soft power activities on behalf of the Kremlin, accompanying GoR officials on cultural missions abroad."

**C.    The TANGO**

> **i.  Vekselberg's Ownership of the TANGO**

34.    As described herein, there is probable cause to believe that Vekselberg is the true beneficial owner of the TANGO.

35.    W-1,[4] a manager at a company ("Company A") that provided services to the TANGO during its design and building phase, stated that the TANGO was designed and built for Vekselberg. W-1 stated that Company A assisted Vekselberg with designing and purchasing the yacht, and that Vekselberg and his home office were involved in certain details of the TANGO's design. W-1 stated that Company A employees met with Vekselberg and his staff at various points in the yacht design / build / delivery process. W-1 also stated that knowing the beneficial owners of a yacht is regularly part of Company A's business. W-1 stated that Company A knew that Vekselberg was the owner of the TANGO and that Vekselberg was involved in the Russian energy market.

36.    W-1 also stated that the TANGO was held in the name of a shell corporation. W-1 stated that the yacht was held in the name of "Arinter." However, W-1 stated that Vekselberg was the true owner and user of the TANGO, and that Vekselberg "never" allowed the yacht to be leased

---

[4]    Company 1 received legal process for its records and information related to the TANGO, and provided responsive documents and information. Company A was told that statements made to the government would not be used against it or W-1 in a criminal prosecution of either, and that Company A and W-1 are not targets of the government's investigation.

or chartered during the time period of Company A's involvement with the TANGO. W-1 knew of no change in ownership during the time Company A provided services for the TANGO.

37.     W-2 was an employee of Company A in 2011.[5] W-2 stated that W-2 worked with Vekselberg and his wife to arrange details related to the construction of the TANGO. W-2 personally met with Vekselberg and confirmed that Vekselberg was the beneficial owner of the TANGO. W-2 knew of no change in ownership of the TANGO during the time W-2 worked at company A.

38.     The TANGO is flagged in the Cook Islands. The Cook Islands government maintains a Ship Registry through an entity known as the Maritime Cook Islands ("MCI"). According to its publicly-available website, MCI "performs all Flag State duties for the Cook Islands government through an agreement with the Ministry of Transport." *See* https://www.cookislandsyachtsquadron.com/yacht-registeration.

   a.   Business records of MCI show that the TANGO was registered in Cook Islands on July 15, 2011 by "Arinter Management, Inc."  ("Arinter").

   b.   Additionally, business records of MCI show that the TANGO has been registered by Arinter in the Cook Islands every year and had various yearly registration fees paid on its behalf.

39.     According to records of MCI, as of 2021, "Arinter Management Inc." is the owning entity of the TANGO, and a Spanish company, Master Yachts Safety S.L., manages the vessel. MCI's 2021 Due Diligence form lists "adrian@masteryachts.com" as the contact email for Arinter and Arinter submitted to MCI a December 2020 "Power of Attorney" form showing that U.K.

---

[5] The assurances given to Company A apply to W-2.

citizen Adrian Berry, Managing Director, Master Yachts Safety S.L., had a power to administer and manage the TANGO.

40.     Bank records received by law enforcement show that, prior to being sanctioned by the Treasury Department, Vekselberg made U.S. dollar payments from accounts in his own name to Arinter and its managers. These payments are consistent with Vekselberg being the true owner of the TANGO.

41.     According to numerous publicly-available news sources, Vekselberg is the owner of the TANGO, including:

    a.     According to a Majorca Daily Bulletin article, the super-yacht, TANGO, is owned by Vekselberg. The article notes that the super-yacht TANGO is registered in the Cook Islands and is one of the largest vessels in the world.[6]

    b.     According to a March 1, 2022, Forbes article, Vekselberg is the owner of the yacht TANGO, registered in the Cook Islands. According to Forbes, the TANGO is valued at $90 million.[7]

42.     On or about March 11, 2022, the Treasury Department also identified as "blocked property" Vekselberg's luxury yacht, the TANGO. According to the designation, "Vekselberg's yacht, Tango, is flagged in the Cook Islands, a self-governing island country in the

---

[6]     Moore, Jason. Yacht Owned by Close Putin Ally in Mallorca Waters (Mar. 1, 2022), *available at* https://www.majorcadailybulletin.com/news/local/2022/03/01/97937/putin-ally-yacht-mallorca.html.

[7]     Tognini, Giacomo. Biden And Allies Are Coming For Russian Billionaires' Yachts: Forbes Tracked Down 36. Here's Where To Find Them (March 1, 2022), *available at* https://www.forbes.com/sites/giacomotognini/2022/03/01/biden-and-allies-are-coming-for-russian-billionaires-yachts-forbes-tracked-down-32-heres-where-to-find-them/?sh=2f661cc3dd70.

South Pacific Ocean in free association with New Zealand, with IMO number 1010703, and gross registered tonnage of 2,083 . . . . Tango [is] valued at approximately $90 million."

43.     Thus, there is probable cause to believe that Vekselberg has owned the TANGO since 2011 and during the entire time in which he was designated by the Treasury Department, and that Vekselberg would have an "interest in" U.S. dollar transactions for the benefit of the TANGO, within the meaning of 31 C.F.R. §§ 589.304, 589.308.

### ii. Structured Financial Transactions and Bank Fraud Involving the TANGO

44.     Between 2011 and the present, Vekselberg engaged in a conspiracy to commit bank fraud and money laundering by obfuscating his ownership interest in the TANGO and therefore causing false information regarding the same to be sent to U.S. banks processing U.S. dollar transactions for the TANGO. Vekselberg caused payments for the TANGO to be run through various shell companies in order to prevent U.S. financial institutions from accurately executing their KYC controls and in order to avoid the filing of SARs related to his financial transactions.

45.     As discussed, the vessel is owned in the name of Arinter, a corporation. Arinter does not have a known internet presence. According to a publicly-available database that tracks corporate registration, Arinter appears to have three employees and be in the management industry.

46.     According to Arinter's corporate records as received by MCI, Arinter is a corporation registered in the British Virgin Islands. Arinter's corporate records list two individual corporate directors, Panamanian citizens Alcides Higuera Gonzalez and Fredis Abdiel Gonzalez. Arinter's corporate records list two organizational corporate directors, "A.J.K. Corporate Management Inc.," a British Virgin Islands corporation, and "RE.A.M. Management Limited," a Cypriot corporation.

     a.   A.J.K. Corporate Management Inc. has no known internet presence.

    b. RE.A.M. Management Limited has no known internet presence. According to a publicly-available database that tracks corporate registration records, RE.A.M. Management Limited has a sister company in Russia by the same name, which has a direct relationship with Renova, Vekselberg's company.

47. According to a publicly-available database that tracks corporate registration records and business records received from financial institutions, Arinter corporate directors Alcides Higuera and Fredis Gonzalez are also officers of Lamesa Transport LLC ("Lamesa Transport"), a Panamanian corporation. Lamesa Transport has no known internet presence. It appears to be an affiliate of other shell companies owned or controlled by Vekselberg. According to bank records received by law enforcement, "Lamesa Holding S.A." is owned by "Lamesa Group Holding S.A.," which in turn is 100% owned by "Lamesa Foundation." All of these entities are registered in Panama. The first beneficiary of "Lamesa Foundation" is "Lamesa Group Incorporated," registered in the British Virgin Islands. "Lamesa Group Incorporated" is wholly owned by Vekselberg.

48. This complicated management and owner structure appears to be for the purpose of obfuscating Vekselberg's connection to the TANGO, in order to insulate the vessel from inquiries about payments made on its behalf.

49. Vekselberg has caused payments to be made to these shell entities, which I believe were in furtherance of supporting the TANGO, but in efforts to obscure his connection thereto:

    a. Vekselberg sent U.S. dollar payments to Lamesa Transport and Arinter:

        i. On or about July 16, 2014, Vekselberg sent a wire payment to Lamesa Transport for $1,105,000, which transited a U.S. correspondent bank in Connecticut.

21

    ii.   On or about December 22, 2017, Vekselberg sent a wire payment to Lamesa Transport for $1,250,000, which transited a U.S. correspondent bank in New York.

    iii.   On or about December 22, 2017, Vekselberg sent a wire payment to Arinter for $1,300,000, which transited a U.S. correspondent bank in Connecticut.

b.   In turn, money from Lamesa Transport's Swiss bank account was transferred to RE.A.M.:

    i.   On January 19, 2017, Lamesa Transport sent a wire payment for $14,611 to RE.A.M. Management Limited in Cyprus, which transited a U.S. correspondent bank in New York.

    ii.   On May 22, 2017, Lamesa Transport sent a wire payment for $24,120 to RE.A.M. Management Limited in Cyprus, which transited a U.S. correspondent bank in New York.

    iii.   On July 17, 2017, Lamesa Transport sent a wire payment for $27,220 to RE.A.M. Management Limited in Cyprus, which transited a U.S. correspondent bank in New York.

    iv.   On November 16, 2017, Lamesa Transport sent a wire payment for $65,620 to RE.A.M. Management Limited in Cyprus, which transited a U.S. correspondent bank.

c.   Money from Arinter's bank account was also transferred between shell corporations:

    i.   On December 22, 2016, an organizational entity called "Tango," and located at "Commerce House, 1 Bowring Road, Ramsey, Isle of Man" sent

a wire payment for $62,500 to Arinter, which transited a U.S. correspondent bank. I have been unable to find any organizational documents showing that the TANGO had its own incorporated entity.

ii. On March 21, 2018, Arinter sent a wire payment for $43,520 to RE.A.M. Management Limited in Cyprus, which transited a U.S. correspondent bank.

50.   Additionally, Arinter paid invoices on behalf of the TANGO from different bank accounts with different entity names, which again appears consistent with an intent to obfuscate the connection with the vessel. For instance, in February-March 2017, the TANGO pulled into a port in Florida in order to have various repairs made.

a.   On or about February 10, 2017, Arinter wired Company C, a yacht servicer, $9,274.97 from a Jersey bank account in the name "Tango, Commerce House, 1 Bowring Road, Ramsey, Isle of Man." The payment transited U.S. financial institutions in New York and California.

b.   On or about February 28, 2017, Arinter wired Company C $11,073.46 from a Swiss bank account in the name of Arinter Management LLC. The payment transited U.S. financial institutions in New York and California.

c.   On or about February 28, 2017, Arinter wired Company D, a yacht servicer, $4,247.50 from the Swiss bank account in the name of Arinter Management LLC. This payment transited U.S. financial institutions in New York and Florida.

d.   On or about March 8, 2017, Arinter wired Company C $1,584.53 from the "Tango" Jersey bank account in the name Tango, Isle of Man. The payment transited U.S. financial institutions in New York and California.

51.    Based on my training and experience, the transferring of money between shell companies, including companies related to each other, is indicative of efforts to hide the true nature of the transactions from U.S. financial institutions, undermine KYC protocols, and prevent the U.S. financial institutions from issuing SARs related to the transactions.

52.    Additionally, based on my training, experience, and review of bank records, U.S. financial institutions regularly reviewed and investigated financial transactions of Russian oligarchs, including Vekselberg, even prior to the imposition of the Russia/Crimea Sanctions.

53.    Thus, there is probable cause to believe that between 2011-present, Vekselberg and his coconspirators conspired to commit bank fraud by structuring transactions about the TANGO in such a manner as to obfuscate Vekselberg's ownership interest therein and in order to cause U.S. financial institutions to process U.S. dollar transactions. Further, there is probable cause to believe that the deceptive practices caused U.S. financial institutions to fail to conduct Know Your Customer investigations on these transactions, to fail to report the transactions to the Treasury Department, and ultimately, to process transactions.

### iii.   Unlicensed U.S. Dollar Payments for the TANGO

54.    Following the April 6, 2018, designation, Vekselberg caused entities and persons to make U.S. dollar payments which transited U.S. financial institutions on his behalf and for his benefit related to the TANGO.

55.    According to bank records received by law enforcement, the following management fees were paid by from a U.S. dollar account located at a Swiss bank in an account in the name of "Tango":

a. On or about April 6, 2018, "Tango" wired $320 to "CAYMAN REGISTRY" as a "cross border credit transfer." The transaction is believed to have been processed as a correspondent banking transaction by a U.S. financial institution.

b. On or about April 6, 2018, "Tango" wired $362.50 to "NRC" as a "cross border credit transfer." The transaction is believed to have been processed as a correspondent banking transaction by a U.S. financial institution.

c. On or about July 18, 2018, "Tango" wired $208,808.20 from its U.S. dollar account to a Euro account in the name of "Tango" held at the same Swiss bank. Using this money, in July 2018, 180,000 Euros in fees were paid to various companies on behalf of the TANGO.

56.    According to business records of Company D, U.S. financial institution, in 2018 Company A had an account in the name of the TANGO and with an address of Company A. On April 10, 2018, Company D determined that Vekselberg was the beneficial owner of the TANGO and blocked the funds in the account, totaling $47,078.

57.    According to business records of Company E, Company E was a subsidiary of a U.S. insurance company. Company E provided insurance to the TANGO in 2018, specifically insuring the TANGO's hull and machinery. Company E cancelled its policy on the TANGO and on or about June 5, 2018, attempted to return $268.66 to Arinter in unused policy funds, however, Company E ultimately decided to block the return of these funds pursuant to E.O. 13622.

58.    According to business records of MCI, Arinter hired Company F to registration services to the TANGO  between 2019-the present. Specifically, Company F has paid registration fees to MCI on behalf of the TANGO. These fees were paid at multiple times a year by Company F. According to MCI, in 2019, Company F paid $27,086.47 to MCI for registration fees related to

the TANGO. These fees were paid in U.S. dollars to MCI's U.S. dollar account and were processed through correspondent banks in the United States.

59.     As previously discussed, your affiant believes that the TANGO has been managed by Master Yachts since at least 2020. According to bank records received during the investigation, Master Yachts manages several yachts, and typically lists the yachts names in the notes of the wire invoices paid on behalf of the yacht.

    a.   According to W-3, a U.S.-based provider of satellite repair on yachts, large yachts like the TANGO are almost exclusively serviced by a single provider ("Company G"), located in Spain. On August 26, 2020, Master Yachts wired 1,780 to Company G and included a reference to "IN20225-IN202487 INVOICES." Master Yachts made several other wire payments to Company G and in the other payments specifically referenced the name of a yacht, leading me to believe that Master Yachts was obfuscating the yacht associated with the August 26, 2020 payment because it is for the TANGO. The transaction was processed as a correspondent banking transaction by a U.S. financial institution in New York.

    b.   According to AIS data of the TANGO,[8] the TANGO called at Male, Maldives from December 21-28, 2020.

---

[8]     According to MarineTraffic, which provides a commercial AIS service, the International Maritime Organization requires an AIS to be fitted on every ship, with exceptions for warships, leisure craft and fishing boats. The system was introduced primarily for safety reasons by helping government authorities to identify vessels, assist in search and rescue operations as well as provide supplementary information from other navigational systems such as radar.  AIS automatically transmits the ship's position and a timestamp.  The ship's operator may also manually update the navigational status, ship's draft, hazardous cargo information, destination and ETA, and waypoints. *See* https://www.marinetraffic.com/blog/information-transmitted-via-ais-signal.

    i.   On December 22, 2020, Master Yachts wired $39,340 to a five-star water villa resort in Male. The transaction included a reference "ARINTER PROFORMA 17-12-2020 M0934." The transaction was processed as a correspondent banking transaction by a U.S. financial institution in New York. Again, while it appears to be Master Yacht's typical business practice to put the name of the yacht the payment relates to in the notes, here too Master Yachts used a generic reference to Arinter, which I believe to be an effort to obfuscate that the payment was related to the TANGO.

    ii.   Between December 23-30, 2020, Master Yachts wired three payments to a company called Seal Maldives Pvt Ltd. According to its website, Seal Maldives purports to be a "Super Yacht Agent" in Male which provides bunkering, maintenance, and provisioning services to yachts. Master Yachts wires to Seal Maldives appear consistent with paying of bills related to the TANGO's stay in Male.

- $173.02 on December 23, 2020
- $3,300.05 on December 23, 2020
- $7,948.00 on December 23, 2020

60.    According to OFAC, Vekselberg and those acting on his behalf failed to obtain licenses for all of the above-described U.S. dollar transactions.

61.    Thus, there is probable cause to believe that from April 6, 2018 to the present, Vekselberg and those acting on his behalf and for his benefit caused U.S. dollar transactions for the TANGO to be sent through U.S. financial institutions, after a time which Vekselberg was designated by the Treasury Department. Further, there is probable cause to believe that Vekselberg

had an interest in the TANGO and the financial transactions for its benefit, and thus a license was required for U.S. dollar transactions, but not obtained.

62.　　Further, there is probable cause to believe that Vekselberg and his coconspirators conspired to and did cause funds to be transferred internationally with the intent to promote the carrying on of his bank fraud conspiracy and IEEPA violations, with the intent to conceal the true nature of the ownership of the proceeds, and with the intent to avoid transaction reporting requirements under federal law.

63.　　Additionally, there is probable cause to believe that under 18 U.S.C. § 981(a)(1)(A) & (C) the TANGO is subject to forfeiture because it was (i) "involved in" a transaction in violation of 18 U.S.C. § 1956, and (ii) "constitutes" "proceeds traceable" to a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D); here, bank fraud and violations of IEEPA).  Specifically, there is probable cause to believe that through the execution of the aforementioned conspiracy, scheme, and criminal violations, Vekselberg was permitted the use and enjoyment of the TANGO, and was able to maintain it in good repair, and thus, that the TANGO is itself "traceable" to the aforementioned violations.

**D.**　　**Exigency**

64.　　On or about March 13, 2022, the U.S. government received a notification from authorities in Spain that the TANGO was being repaired, but was making plans to leave the port of Palma de Mallorca.

65.　　Your affiant notes that, following the March 2022 designations by the Treasury Department of several Russian oligarchs, many such designated individuals made efforts to move their yachts out of European jurisdictions and into jurisdictions that do not have mutual legal

assistance treaties with the United States. Your affiant believes that Vekselberg may likewise be making plans for the TANGO to leave Spain in an effort to avoid U.S. efforts to seize the vessel.

## IV.   <u>CONCLUSION</u>

66.     Based on the information contained herein and my training and experience, I submit that the TANGO is subject to seizure and forfeiture, pursuant to the above referenced statutes. Based on the forgoing, I request that the Court issue the proposed seizure warrant.  Because of the exigent circumstances described above, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

67.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Seizure Warrant. I submit that Assistant U.S. Attorney

Karen P. Seifert, an attorney for the United States, is capable of identifying my voice and telephone

number for the Court.


                                    Respectfully submitted,



                                    Cindy Burnham, Special Agent
                                    Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 25, 2022.



_____
HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA