UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE AND SEARCH OF THE MOTOR YACHT TANGO, WITH INTERNATIONAL MARITIME ORGANIZATION NUMBER 1010703 | No. 22-SZ-5 |

**ORDER**

On March 25, 2022, the government submitted an Application for a Seizure Warrant ("Application") to seize the Motor Yacht (M/Y) Tango (the "Target Property") in the port of Palma de Mallorca. *See* ECF No. 1 (Application for Seizure Warrant and Accompanying Documents) ("Warrant"). This Court, having reviewed the Application and accompanying Affidavit in Support ("Affidavit"), found that there was probable cause to believe the Target Property was subject to forfeiture under 18 U.S.C. § 981(a) and § 982(a) and GRANTED the Application.[1]

**I.      BACKGROUND**

Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*, the President of the United States has authorized various sanctions to respond to the threats posed to the stability and sovereignty of Ukraine. *See* Affidavit ¶ 8. The Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to avoid such sanctions programs. *See id.* ¶ 19. Willfully circumventing of these sanctions, or causing others to do so, is a

---

[1] The Court issues this opinion to memorialize the basis for its findings. The Court presented the government with an opportunity to make any necessary redactions prior to publishing the opinion.

criminal violation of IEEPA (50 U.S.C. § 1705), *see, e.g.*, *United States v. Zarrab*, No. 15-cr-867, 2016 WL 6820737, at *9 (S.D.N.Y. Oct. 17, 2016), and deceiving banks which are trying to enforce such sanction programs is bank fraud (18 U.S.C. § 1344), *see, e.g.*, *Matter of Search of Multiple Email Accts. Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956*, No. 20-SC-3310, 2022 WL 406410, at *8 (D.D.C. Feb. 8, 2022). The laundering of the funds involved in either such transactions is a money laundering violation (18 U.S.C. § 1956). *See generally id.* at 9.

Certain categories of property related to violations of these law are subject to criminal and civil forfeiture. *See generally* Stefan D. Cassella, Asset Forfeiture Law in the United States (2d ed. 2013). 18 U.S.C. § 981(a)(1)(B) provides for civil forfeiture of property that constitutes "proceeds traceable" to a specified unlawful activity (as defined in 18 U.S.C. § 1956(c)(7)(D)), which includes bank fraud and violations of IEEPA. 18 U.S.C. § 982(a) and 28 U.S.C. § 2461(c) provide for criminal forfeiture for the same violations. The civil and criminal money laundering forfeiture provisions extend beyond the proceeds of the crime to include property "involved in" the scheme. *See* 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1). These latter provisions are broader because "money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme." *United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019) (quoting *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)).

## II.     ANALYSIS

### A.     Jurisdiction To Seize

The government has established probable cause to believe that the Target Property, a 255-foot luxury yacht, is owned by sanctioned Russian oligarch Viktor Vekselberg. *See* Affidavit ¶ 34.

The U.S. Treasury Department, Office of Foreign Assets Control (OFAC), which is located in Washington, D.C., designated Vekselberg as part of U.S. sanctions on Russia. *See id.* The government has further established probable cause to believe Vekselberg structured transactions involving the Target Property to conceal his identity, including through the use of shell companies, as part of a scheme to violate IEEPA and the bank fraud statute, both of which were part of a related international promotional money laundering scheme. *See* Affidavit ¶¶ 55, 62. These transactions are subject to U.S. jurisdiction as they passed through the United States while the correspondent banks processed the transactions. *See* Affidavit ¶ 44. The affidavit finally establishes jurisdiction over the Target Property by demonstrating by probable cause that the Target Property is proceeds of the IEEPA and bank fraud violation and is property involved in the money laundering violations. *See* Affidavit ¶¶ 53, 63. Thus, the Target Property is subject to forfeiture under 18 U.S.C. §§ 981(a) and 982(a).

But the inquiry does not end there. The "Court must have venue to issue a [seizure] warrant." *Investigation of Violation of 18 U.S.C. § 1956*, 2022 WL 406410, at *3. That is, there must be "reason to believe" that the property subject to forfeiture is located within the district or a place Congress has empowered the court to act. *See United States v. Thorne*, 548 F. Supp. 3d 70, 126 (D.D.C. 2021), as corrected (July 16, 2021). Specifically, Congress empowered the District Court for the District of Columbia to seize property located in a foreign country. *See* 28 U.S.C. § 1355(b)(2).[2] Thus, this Court has jurisdiction and venue to issue a seizure warrant for the

---

[2] The Target Property is held in a foreign port and therefore located in a foreign country, but if it were found in another location where it was seized by a foreign government or on the high seas, this Court would similarly have jurisdiction/venue. *See* 28 U.S.C. § 1355(b)(2); 28 U.S.C. § 2461(b); *United States v. All Petroleum-Prod. Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, No. CV 20-1791, 2020 WL 3771953, at *1 (D.D.C. July 2, 2020).

overseas Target Property pursuant to 18 U.S.C. §§ 981(b)(3) and 982(b)(1), and 21 U.S.C. § 853(f).[3]

B. <u>Jurisdiction To Search</u>

The Government initially requested authority to search the documents, electronics, and items located in the Target Property. The Court rejected this request as it does not have venue to issue a search warrant for property held at a foreign port under Rule 41 of the Federal Rules of Criminal Procedure.[4] And no other statutory basis exists for such extraterritorial authority. However, the Government may choose to bring copies of the contents of these items to a location where this Court has venue, including within the District of Columbia, *see* Rule 41(b)(1), any U.S. territory, *see* Rule 41(b)(5)(A), or a U.S. embassy or consulate abroad, *see* Rule 41(b)(5)(B).

Yet, no warrant to search is needed here and seeking a search warrant for the sake of a warrant is questionable. *See Matter of Search of Encrypted Data*, No. 20-SW-321, 2021 WL 2100997, at *3 (D.D.C. May 22, 2021) (refusing warrant based on judicial economy). Generally speaking, a person must have a reasonable expectation of privacy for the Fourth Amendment to apply and for a search warrant to be required. *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring). The Fourth Amendment does not apply to the search and seizure of property owned by a nonresident alien located in a foreign country. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 259 (1990). As such, Vekselberg, a foreign national, lacks a reasonable expectation of privacy in the Target Property. *See id.; United States v. Loera*, 333 F. Supp. 3d 172, 182 (E.D.N.Y. 2018), *aff'd sub nom. United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022)

---

[3] The Target Property is easily moved and could not be seized except for by a seizure warrant, as opposed to be a restraining order. *See* 21 U.S.C. § 853(f).

[4] Rule 41 does have limited extraterritorial venue provisions, however, none are applicable here.

(defendant citizen of Mexico, lacking substantial voluntary connections to United States, cannot invoke Fourth Amendment for searches in the Netherlands).

    C.    <u>Forfeiture</u>

Forfeitures are punitive, and thus the Excessive Fines Clause of the Eighth Amendment limits the Government's forfeiture power. *See Austin v. United States*, 509 U.S. 602, 609–10 (1993). A forfeiture violates the Excessive Fines Clause only "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).[5] However, any Excessive Fines challenges at this stage are premature as Eighth Amendment issues are not ripe until after a court enters a civil or criminal forfeiture order. *See, e.g.*, *United States v. Sum of $70,990,605,* 4 F. Supp. 3d 189, 207-208 (D.D.C. 2014); *In the Matter of the Search of One Address in Washington, D.C., Under Rule 41*, 512 F. Supp. 3d 23, 30 n.12 (D.D.C. 2021).

Even if an Eighth Amendment challenge was ripe now, it utterly fails. Courts considering whether a forfeiture is "grossly disproportional" under *Bajakajian* consider several factors—and while circuits differ in precisely which factors they use, all consider the nature of the harm caused by the wrongdoer's conduct. *See, e.g.*, *United States v. Suarez,* 966 F.3d 376, 385 (5th Cir. 2020); *Bikundi*, 926 F.3d at 795; *United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011). In money laundering and bank fraud cases, the court must consider the harm to society in general. *See United States v. Waked Hatum*, 969 F.3d 1156, 1169 (11th Cir. 2020), *cert. denied sub nom. Hatum v. United States*, 142 S. Ct. 72, 211 L. Ed. 2d 12 (2021). Society suffers "when

---

[5] If the Government could show the Target Property "constitutes" "proceeds" of the bank fraud and IEEPA violations, forfeiture of the Target Property would not be limited by the Eighth Amendment. Forfeiture of the proceeds of a crime is proportional to the crime itself. *See, e.g.*, *United States v. Bikundi,* 926 F.3d 761, 795 (D.C. Cir. 2019); *Matter of Search of One Address in Washington, D.C., Under Rule 41*, 512 F. Supp. 3d 23, 30 (D.D.C. 2021) (quoting *United States v. Powell*, 2 F. App'x 290, 294 (4th Cir. 2001) ("The forfeiture of proceeds relieves the defendant of his illegal gain, and therefore cannot be excessive.").

criminally derived funds are laundered to allow the criminal unfettered, unashamed and camouflaged access to the fruits of those ill-gotten gains." *Waked Hatem*, 969 F.3d at 1169; United States v. O'Kane, 155 F.3d 969, 972–73 (8th Cir. 1998). As sanctions protect national security, violations of IEEPA require a broader consideration of the harm to U.S. national security interests. Indeed, "there is a compelling governmental interest in maintaining national security and public safety" via IEEPA and the related sanctions regime. *United States v. Islamic Am. Relief Agency*, No. 07-cr-087, 2009 WL 4016478, at *3 (W.D. Mo. Nov. 18, 2009) (citing *Haig v. Agee*, 453 U.S. 280, 307 (1981)) ("Protection of the foreign policy of the United States is a governmental interest of great importance, since foreign policy and national security considerations cannot neatly be compartmentalized.").

The harm to society here is acute. The laundered funds structured around the Target Property are part of a pattern of corruption used to circumvent U.S. sanctions. Vekselberg is a Russian Oligarch whom OFAC has sanctioned initially in response to Russia's annexation of Crimea and the threat posed to Ukraine's "peace, security, stability, sovereignty, and territorial integrity." Exec. Order No. 13660 (2014). OFAC further designated Vekselberg under new sanctions passed in response to Russia's invasion of Ukraine, in part for Vekselberg having acted, directly or indirectly, on behalf of the Russian government. *See Treasury Sanctions Kremlin Elites, Leaders, Oligarchs, and Family for Enabling Putin's War Against Ukraine*, U.S. Department of the Treasury, *available at* https://home.treasury.gov/news/press-releases/jy0650.

The U.S. sanctions demonstrate that Vekselberg, like other Oligarchs, has been critical to perpetuating Putin's regime. *See id.* Here, the illicit proceeds and laundered funds which the government tied to the Target Property exacerbated the grave social harm that is Putin by concealing Vekselberg's identity—thereby allowing him to subvert U.S. sanctions and bank anti-

money laundering programs and corruptly enrich himself. That corruption is the financial and political capital lifeblood for Russia's invasion of Ukraine and slaughter of innocent civilians. *See id.* The brutality of which is just coming to light: including the possible commission of war crimes. *See United Nations names experts to probe possible Ukraine war crimes*, Reuters, https://www.reuters.com/world/europe/un-names-experts-probe-possible-war-crimes-ukraine-2022-03-30/.

The harm from financial crimes like money laundering and bank fraud is often abstract and difficult to measure—such as impeding law enforcement, *see United States v. Acuna*, 313 Fed. Appx. 283, 299 (11th Cir. 2009), or generally propping up other criminal activity, *see United States v. Mora*, 644 F. App'x 316, 318 (5th Cir. 2016). But the harm here is stark and quantifiable. The United Nations recorded 1,232 civilian deaths and 1,935 injuries in Ukraine as of March 20, 2022—figures it believes to be extremely conservative. *See* Office of the High Commissioner for Human Rights, United Nations, *Ukraine: Civilian Casualty Update*, *available at* https://www.ohchr.org/en/press-releases/2022/03/ukraine-civilian-casualty-update-31-march-2022. At least fifty hospitals have been damaged in Russian attacks, according to U.N. monitors, and schools and homes remain under fire as well. *See Russia may have committed 'war crimes' in Ukraine*, Reuters (Mar. 30, 2022), https://www.reuters.com/world/europe/russian-shelling-attacks-cities-may-amount-war-crimes-says-uns-bachelet-2022-03-30/. While exact figures surrounding deaths of Ukrainian and Russian troops are difficult to obtain, estimates as high as 15,000 Russian troops killed in only one month foreshadow a death toll in the tens of thousands. *See Russia could have lost as many as 15,000 troops in Ukraine war*, Washington Post (Mar. 24, 2022), https://www.washingtonpost.com/world/2022/03/24/russia-troops-casualties-nato-ukraine/.

If the U.S. government allows Russian oligarchs to evade sanctions without any consequences, they will continue to "[e]nabl[e] Putin's War Against Ukraine," U.S. Department of the Treasury, *available at* https://home.treasury.gov/news/press-releases/jy0650. Far from being grossly disproportionate to Putin's murder of civilians, destruction of Ukrainian cities, and attack on Ukraine's sovereignty, forfeiture of the Target Property is wholly justified. The seizure of the Target Property is just the beginning of the reckoning that awaits those who would facilitate Putin's atrocities. Neither the Department of Justice, nor history, will be kind to the Oligarchs who chose the wrong side.

### III.   CONCLUSION

The Department of Justice's seizure echoes the message of the brave Ukrainian soldiers of Snake Island. *See* https://www.cnn.com/2022/03/13/europe/snake-island-satellite-photos-intl-hnk/index.html.

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE